DOUGLAS L. BUTLER v. WILLIAM T. BERKELEY AND THE CHAR-
  LOTTE-MECKLENBURG HOSPITAL AUTHORITY, INC., A COR-
  PORATION

No. 7426SC1099

(Filed 16 April 1975)

1. **Rules of Civil Procedure § 56— motion for summary judgment — evi-
    dence considered**
      At the hearing on a motion for summary judgment, the court
    may consider the pleadings, affidavits meeting the requirements of
    G.S. 1A-1, Rule 56(e), depositions, answers to interrogatories, admis-
    sions, oral testimony, documentary materials, facts which are subject
    to judicial notice, and such presumptions as would be available upon
    trial.

Butler v. Berkeley

**2. Rules of Civil Procedure § 56— motion for summary judgment — burden of proof**

Upon motion for summary judgment the movant has the burden of establishing that there is no genuine issue of fact remaining for determination, and if he meets that burden of proof, he is entitled to judgment as a matter of law; the party opposing the motion has no burden of coming forward with evidentiary material in support of his claim until movant has produced evidence of the necessary certitude which negatives the opposing party's claim in its entirety.

**3. Physicians and Surgeons § 16— malpractice action — plastic surgery — representations and warranties — summary judgment**

In a malpractice action against a plastic surgeon, the trial court erred in entering summary judgment against plaintiff on his claim based on alleged representations and warranties by defendant that upon completion of a surgical procedure plaintiff's face would be symmetrical and he would be able to open his mouth wider than before surgery; that the surgical procedure was simple and required only four or five days of hospitalization; that there would be very little post-operative discomfort, consisting primarily of a little swelling in the area of the left cheekbone; and that the surgical procedure would not adversely affect plaintiff's left eye.

**4. Physicians and Surgeons § 16; Rules of Civil Procedure § 56— malpractice action — conclusions of pleader — consideration on summary judgment motion**

Allegations that defendant plastic surgeon was negligent in furnishing post-operative care in that he failed to exercise the degree of skill, care, and knowledge ordinarily exercised in similar cases by other plastic surgeons in Charlotte, N. C. or in a similar community were mere conclusions of the pleader and should not be considered in determining a motion for summary judgment.

**5. Rules of Civil Procedure § 56— motion for summary judgment — sufficiency of complaint**

The sufficiency of the allegations of the complaint do not determine the motion for summary judgment.

**6. Physicians and Surgeons § 17— malpractice action — negligence in post-operative care — summary judgment**

In a malpractice action against a plastic surgeon, the trial court properly entered summary judgment against plaintiff on his claim that defendant was negligent in his post-operative care of plaintiff in that plaintiff ingested fluids by mouth with defendant's knowledge that plaintiff had removed a nasal gastric tube inserted to prevent food from contaminating the packing and that ingestion of the fluids caused the infection complained of where the evidence presented by deposition showed that if the ingestion of food was a proximate cause of the infection, and if defendant was negligent in his post-operative care, plaintiff was, nevertheless, the sole author of his own misfortune.

7. **Physicians and Surgeons § 16— malpractice action — surgery without informed consent — battery — summary judgment**

   . In a malpractice action against a plastic surgeon, the trial court properly denied plaintiff's motion for summary judgment and properly allowed defendant's motion for summary judgment on plaintiff's claim that the operation in question constituted a battery upon plaintiff in that defendant withheld from plaintiff information with respect to the risks and other material facts involved in the surgery and operated on plaintiff without his informed consent where there was no evidence of any representation made by defendant which was false to the knowledge of defendant or of any facts which might nullify plaintiff's consent to the surgery.

APPEAL by plaintiff from *Fountain, Judge.* Judgment entered 3 October 1974 in Superior Court, MECKLENBURG County. Heard in the Court of Appeals 14 March 1975.

This is a malpractice action brought by plaintiff, a patient of defendant Dr. William T. Berkeley, and the Charlotte-Mecklenburg Hospital Authority, Inc., which operates the Charlotte Memorial Hospital. Dr. Berkeley, a plastic surgeon, performed a surgical procedure on plaintiff's face at the Charlotte Memorial Hospital, and plaintiff was thereafter treated at the hospital and in Dr. Berkeley's office. The operation was performed on 28 November 1970, and plaintiff was released from the hospital on 10 December 1970. A pin which had been placed in plaintiff's cheek was removed on 11 January 1971 and 17 days thereafter infection in the site was apparent for the first time. Dr. Berkeley immediately prescribed antibiotics, but despite his repeated attempts to halt the infection, he was not able to control it until after the removal of (1) a silicone disc, which had been placed under the bone supporting the eye, and (2) necrotic bone, which had "died" as a result of the infection.

In his complaint, plaintiff alleged three causes of action. The first alleged a breach by Dr. Berkeley of his representations, guarantees, and warranties "that upon completion of the surgical procedure" the plaintiff's face would be symmetrical, and he "would be able to open his mouth wider than before surgery; that the surgical procedure was simple, requiring only four (4) or five (5) days hospitalization; that there would be very little post-operative discomfort, consisting primarily of a little swelling in the area of the left cheekbone; that the surgical procedure definitely would not adversely affect the plaintiff's left eye". The second cause of action alleged negligence on the part of Dr. Berkeley in the performance of the surgical procedure

"without using sterile techniques" and in his failure to remove certain bone fragments in the area of the surgery. He also alleged negligence in Dr. Berkeley's post-operative care of plaintiff. He alleged the hospital was negligent in keeping "the steel prosthetic device and the silicone implants" in an unsterile condition and in failing to follow sterile procedures in the course of the surgical procedure. The third cause of action alleged that the operation constituted and was a battery upon plaintiff for that Dr. Berkeley withheld from plaintiff information with respect to the risks and other material facts involved in the surgery and operated on plaintiff without his informed and intelligent consent.

Each defendant answered and denied any breach of any duty owed by him or it to plaintiff. The deposition of plaintiff was taken as was the deposition of Dr. Berkeley. Thereafter each defendant moved, under Rule 56, for summary judgment for that there is no issue as to any material fact and it affirmatively appears from the depositions taken that there was no breach of any duty to plaintiff. Plaintiff also moved, under Rule 56, for summary judgment for that "there is no issue as to any material fact to deny the plaintiff's claim grounded on lack of informed consent". The court entered judgment denying plaintiff's motion for summary judgment and allowing Dr. Berkeley's motion as to all three causes of action and the hospital's motion as to the second cause of action, the only one relating to the hospital. From entry of the judgment, plaintiff appealed.

*Whitfield, McNeely, Norwood & Badger, by David R. Badger, for plaintiff appellant.*

*Carpenter, Golding, Crews & Meekins, by John G. Golding, for appellee Dr. William T. Berkeley.*

*Boyle, Alexander and Hord, by B. Irvin Boyle, for appellee The Charlotte-Mecklenburg Hospital Authority, Inc.*

MORRIS, Judge.

At the outset, we note that plaintiff candidly concedes that he has produced no evidence to substantiate his contentions concerning unsterile procedures used by defendants. Since this was the only basis for the cause of action against the hospital, we do not discuss plaintiff's appeal from the summary judgment in favor of the hospital. It is affirmed.

Butler v. Berkeley

Each movant supported the motion for summary judgment with the deposition of Dr. Berkeley and the deposition of plaintiff, and no party filed any affidavit in opposition to the motions made against him or it, although Dr. Berkeley did file a response to plaintiff's motion for summary judgment in which he referred to the testimony given in both depositions.

[1]   At the hearing on a motion for summary judgment, the court may consider the pleadings, affidavits meeting the requirements of G.S. 1A-1, Rule 56(e), depositions, answers to interrogatories, admissions, oral testimony, documentary materials, facts which are subject to judicial notice, and such presumptions as would be available upon trial. *Singleton v. Stewart,* 280 N.C. 460, 186 S.E. 2d 400 (1972).

> "A verified complaint may be treated as an affidavit if it (1) is made on personal knowledge, (2) sets forth such facts as would be admissible in evidence, and (3) shows affirmatively that the affiant is competent to testify to the matters stated therein." *Page v. Sloan,* 281 N.C. 697, 705, 190 S.E. 2d 189 (1972), and cases cited therein.

[2]   Although upon trial of issues raised by the pleadings the plaintiff would have the burden of proof, upon motion for summary judgment the movant has the burden of establishing that there is no genuine issue of fact remaining for determination. If he meets that burden of proof, he is entitled to judgment as a matter of law. *Savings & Loan Assoc. v. Trust Co.,* 282 N.C. 44, 191 S.E. 2d 683 (1972); *Whitley v. Cubberly,* 24 N.C. App. 204, 210 S.E. 2d 289 (1974); *Tolbert v. Tea Co.,* 22 N.C. App. 491, 206 S.E. 2d 816 (1974). The party opposing the motion has no burden of coming forward with evidentiary material in support of his claim until movant has produced evidence "of the necessary certitude which negatives plaintiff's claim against it in its entirety." *Whitley v. Cubberly, supra,* at 206; *Tolbert v. Tea Co., supra.*

> "Furthermore, in passing upon a motion for summary judgment, all affidavits, depositions, answers to interrogatories and other material filed in support or opposition to the motion must be viewed in the light most favorable to the party opposing the motion, and such party is entitled to the benefit of all inferences in his favor which may be reasonably drawn from such material. *United States v. Diebold, Inc.,* 369 U.S. 654, 8 L.Ed. 2d 176, 82 S.Ct. 993

(1962); *Page v. Sloan,* 281 N.C. 697, 190 S.E. 2d 189 (1972)." *Whitley v. Cubberly, supra,* at 206-207.

[3] When these principles are applied to defendant's motion for summary judgment with respect to plaintiff's first cause of action, we conclude that defendant failed to carry the burden of proof so as to entitle him to summary judgment as a matter of law.

In paragraph 7 of his complaint, plaintiff alleged:

"After examination by defendant William T. Berkeley of the scar heretofore described, defendant William T. Berkeley informed plaintiff that his left cheekbone was depressed; that defendant William T. Berkeley then specifically represented, guaranteed and warranted to plaintiff that, for a consideration, hereinafter more fully stated, defendant William T. Berkeley would raise the left cheekbone so it would exactly match the right cheekbone, in addition to removing the scar heretofore described; that the surgical procedure would improve the appearance of plaintiff's face by making the left side of plaintiff's face completely symmetrical with the right side of plaintiff's face; that defendant William T. Berkeley represented, guaranteed and warranted to the plaintiff that upon completion of the surgical procedure to make the plaintiff's face symmetrical that the plaintiff would be able to open his mouth wider than before surgery; that the surgical procedure was simple, requiring only four (4) or five (5) days hospitalization; that there would be very little post-operative discomfort, consisting primarily of a little swelling in the area of the left cheekbone; that the surgical procedure definitely would not adversely affect the plaintiff's left eye."

In his deposition defendant testified that in his first conference with plaintiff, "we pointed out that the cheekbone could be improved and elevated." Further, "[w]e explained, with the skull, we explained that it was a common procedure to elevate the cheekbone secondary to an old trauma or a depressed cheekbone or a depression of a congenital deformity, that one could open the tripart type fracture, meaning the cheekbone, elevate the cheekbone, bring it up to normal position and then to fix it in a normal position and hold it there until it became solid and fused bone and then remove the pin." Defendant testified that on the occasion of plaintiff's first visit in July, nothing

was said about involvement of plaintiff's eye. He further testi-fied that plaintiff returned in October and that on that visit defendant again explained the surgical procedure in detail but that he does not recall whether he made any statement about the eye.

We cannot say that defendant produced evidence of the necessary certitude which negatived plaintiff's claim in the first cause of action in its entirety.

The deposition of plaintiff was taken by agreement of both parties. The record is silent as to whether it was submitted by plaintiff in opposition to defendant's motion or by defendant in support of his motion. The record indicates only that it was considered by the court. In any event, considering the deposition with plaintiff's verified complaint, and treating the complaint as an affidavit in compliance with G.S. 1A-1, Rule 56(e), containing allegation of facts admissible in evidence, and viewing all the material considered by the court in the light most favorable to plaintiff, as we are required to do, we are constrained to hold that on the present record the court committed error in granting defendant's motion for summary judgment as to the plaintiff's first cause of action. Whether plaintiff will be able to meet his burden of proof upon a trial of the issues is another question.

[4, 5]  Plaintiff's second cause of action is bottomed on negligence. He alleges that the hospital kept and allowed to be used and that Dr. Berkeley did use a prosthetic device and items of silicone which were not sterile and that Dr. Berkeley failed to use sterile procedures in the insertion of the pin and the implanting of the silicone. Dr. Berkeley testified that the infection which manifested itself after the removal of the pin and the silicone did not result from the use of either, that it was a rare occurrence, and he could not say exactly what caused it but that no mistakes or "slips" occurred during the surgery and he performed the operation in accordance with the generally accepted standards and procedures for persons in the specialty of plastic surgery performing such an operation. Plaintiff candidly concedes in his brief and stated on oral argument that there is no evidence to support allegations in the complaint as to negligence. He does contend in his brief that there is a genuine issue of fact as to whether the ingestion of fluids by plaintiff was with Dr. Berkeley's concurrence and caused the infection of which plaintiff complains. He alleged in the second

cause of action that Dr. Berkeley was negligent in furnishing post-operative care "in that he failed to exercise the degree of skill, care, and knowledge ordinarily exercised in similar cases by other surgeons specializing in plastic and reconstructive surgery in the City of Charlotte, County of Mecklenburg, State of North Carolina, or in a similar community." These are mere conclusions of the pleader and not to be considered in opposition to or in support of a motion for summary judgment. *Singleton v. Stewart, supra.* Neither does plaintiff allege the respects in which the defendant was negligent in his post-operative care. However, the sufficiency of the allegations of the complaint do not determine the motion for summary judgment. 6 Moore, Federal Practice, 2d Ed. (1971), § 56.04[1], p. 2059. "If this were not the case, Rule 56 would be a nullity for it would merely duplicate the motion to dismiss." *Lindsey v. Leavy,* 149 F. 2d 899, 902 (C.A. 9th Cir. 1945), cert. denied, 326 U.S. 783, 66 S.Ct. 331, 90 L.Ed. 474 (1946). The motion pierces the bare pleadings, allegations and penetrates to the factual core of the controversy. *Singleton v. Stewart, supra.*

[6] With these principles in mind we look at the evidence presented by the two depositions before the court. Dr. Berkeley's evidence, considered in the light most favorable to plaintiff, is that the plaintiff did ingest fluids by mouth, with the knowledge of defendant that the nasal gastric tube inserted to prevent protein, milk, or food in the mouth from contaminating the packing had been removed by plaintiff; that the hospital record showed that "patient took fluids PO (by mouth) despite being advised that this was against physician's orders"; that his having taken those fluids by mouth could have conceivably introduced contamination and caused infection.

Plaintiff, by his deposition, testified that he had a tube "through my nose" and that he was fed ground-up foods through that tube; that about the tenth day, as the result of "nerves," he jerked the tube from his nose. The nurse came in and advised him that he couldn't do that because "they didn't want anything to happen because of this up in here" (referring to the incision in his mouth) ; that he had been swallowing "ice cubes and things like that"; that he refused to allow the nurse to put the tube back in; that he called Dr. Berkeley, told him the situation with respect to his nerves and nausea and that he agreed to leave the tube out.

Butler v. Berkeley

"... [F]unctionally the theory underlying a motion for summary judgment is essentially the same as the theory underlying a motion for directed verdict. The crux of both theories is that there is no genuine issue of material fact to be determined by the trier of the facts, and that on the law applicable to the established facts the movant is entitled to judgment. As Justice Jackson stated in *Sartor v. Arkansas Natural Gas Co.* [321 U.S. 620, 624, 64 S.Ct. 724, 88 L.Ed. 967 (1944)] 'a summary disposition ... should be on evidence which a jury would not be at liberty to disbelieve and which would require a directed verdict for the moving party.'" 6 Moore, Federal Practice, 2d Ed., § 56.02[10] p. 2043.

The evidence presented by the depositions compels the conclusion that if, indeed, the ingestion of food was a proximate cause of plaintiff's damages as the result of infection, and if defendant was negligent in his post-operative care and did not exercise the standard of care other physicians would have exercised, the plaintiff was, nevertheless, the sole author of his own misfortune. Plaintiff's own evidence would require a directed verdict for defendant.

The summary judgment as to plaintiff's second cause of action was properly allowed.

[7] We turn now to the third cause of action. Here plaintiff bottoms his claim on the allegation that defendant undertook to perform surgery on plaintiff without first obtaining plaintiff's informed and intelligent consent and, therefore, committed a battery upon plaintiff, which battery directly and proximately resulted in plaintiff's injury and damage.

In support of this theory of the third cause of action, plaintiff alleges that defendant "failed to advise plaintiff of the serious nature of the proposed operation" and "to advise [him] that there was a risk of damage to plaintiff's left eye and left cheek"; that "plaintiff's consent to the performance of this surgical operation was given in reliance upon the representations that the operation was a simple procedure with no danger of post-operative complications, damage to plaintiff's left eye, or damage to plaintiff's left cheek"; that defendant "withheld the risks and material facts involved in the surgery in that defendant represented to plaintiff that said surgery was a simple procedure with no possibility of complications of any kind and

further that plaintiff's appearance would be greatly improved."
There is no allegation of negligence in this third cause of action.

Plaintiff appeals from the denial of his motion for sum-
mary judgment and the allowance of defendant's motion for
summary judgment.

With respect to plaintiff's motion for summary judgment,
the plaintiff, of course, had the laboring oar. That he consented
to the operation is not in dispute. Plaintiff has apparently
sought to bring his action within the perimeters suggested by
Justice Bobbitt (later C.J.) in his concurring opinion in *Hunt
v. Bradshaw,* 242 N.C. 517, 88 S.E. 2d 762 (1955). In comment-
ing on the fact that plaintiff there had grounded his action on
the alleged negligence of defendant rather than assault and
battery and, therefore, did not allege that the representations
allegedly negligently made were "false to the knowledge of the
defendant or other facts that might nullify his consent to the
operation."

Justice Bobbitt further said:

"An unauthorized operation constitutes as assault and
battery, *i.e.,* trespass to the person. As stated by Judge
*Cordozo,* speaking for the Court of Appeals of New York:
'Every human being of adult years and sound mind has a
right to determine what shall be done with his own body;
and a surgeon who performs an operation without his
patient's consent commits an assault, for which he is liable
in damages. *Pratt v. Davis,* 224 Ill. 300, 79 N.E. 562, 7
L.R.A. (N.S.) 609, 8 Ann. Cas. 197; *Mohr v. Williams,* 95
Minn. 261, 104 N.W. 12, 1 L.R.A. (N.S.) 439, 111 Am. St.
Rep. 462, 6 Ann. Cas. 303. This is true, except in cases of
emergency where the patient is unconscious, and where it
is necessary to operate before consent can be obtained.'
*Schloendorff v. New York Hospital,* 211 N.Y. 125, 105
N.E. 92, 52 L.R.A. (N.S.) 505, Ann. Cas. 1915C, 581. See
also, *Bennan v. Parsonnet,* 83 N.J.L. 20, 83 Atl. 948; *Moos
v. United States,* 118 F. Supp. 275. In *Mohr v. Williams,
supra, Brown, J.,* quotes 1 Kinkead on Torts, sec. 375, viz:
'The patient must be the final arbiter as to whether he will
take his chances with the operation, or take his chances
of living without it. Such is the natural right of the in-
dividual, which the law recognizes as a legal one. Consent,
therefore, of an individual, must be either expressly or

impliedly given before a surgeon may have the right to
operate.' And there is authority to the effect that consent
to perform an operation is not valid if induced by repre-
sentations that are false to the knowledge of the surgeon
who makes them. *Birnbaum v. Siegler,* 273 App. Div. 817,
76 N.Y.S. 2d 173; *Pratt v. Davis, supra; Wall v. Brim,* 138
F. 2d 478; *Nolan v. Kechijian,* 75 R.I. 165, 64 A. 2d 866;
*Robinson v. Crotwell,* 175 Ala. 194, 57 So. 23; *Wall v. Brim,*
145 F. 2d 492.

Whether plaintiff's evidence would be sufficient for sub-
mission to the jury had he elected to bring his action on
the ground of injury resulting from an unauthorized opera-
tion is not presented for decision on this record. Suffice it
to say, plaintiff did not bring such action."

Neither did plaintiff here allege that the representations were
false to the knowledge of defendant. Assuming, however, that
the allegations sufficiently allege a cause of action grounded on
a battery and that this is the basis which plaintiff intended for
the third cause of action; and noting again that the plaintiff
acknowledges his actual consent to the operation, then the focus
must shift from plaintiff's lack of consent to whether defendant
misinformed plaintiff or misrepresented to plaintiff, by omis-
sion or otherwise, the nature of the surgery which he intended
to perform on plaintiff. See for a full discussion of problems
attendant upon malpractice suits based on a battery as com-
pared with those based on negligence, Note, *Duty of Doctor to
Inform Patient of Risks of Treatment: Battery or Negligence?,*
34 So. Cal. L. Rev. 217 (1961), and Shartis, *Informed Consent:
Some Problems Revisited,* 51 Nebraska L. Rev., No. 4, 527
(1972). Directing our attention to the deposition of plaintiff
with respect to the focal point suggested above, we find that
plaintiff testified that he had received a laceration to his face
in an auto collision necessitating nine stitches and resulting in
a jagged scar on his cheek. He went to see defendant to deter-
mine whether there could be a revision of the scar by plastic
surgery. He further testified that his face was disfigured in
that one cheekbone was depressed, one ear lower than the other,
and he could not open his mouth very wide. This had been true
all of his life but had not resulted from any trauma. He went
to defendant to "see if he could fix" the scar and defendant
noticed the cheekbone depression. He first asked about the scar
and then the cheekbone. "And he [defendant] said that, as far

as the cheekbone, that he could fix it and that it shouldn't be any problem as far as that goes. He said there's no problem, and he took me in his room and he had a skull, and he pointed out to me exactly where I would be cut, . . ." Defendant explained that he would make the necessary incisions inside the mouth and there would be a small scar at the outside of plaintiff's left eye and that would be gone over and "Z'd" after the cheekbone had been broken and moved into better position. Defendant told plaintiff he would have to use a pin to hold it all together. Plaintiff asked "Is that gonna hurt," and defendant replied "No, it's not going to cause any discomfort whatsoever." Plaintiff further said, "and it did not; it didn't hurt me a bit. I figured it went right through my sinus. I figured it would hurt like hell, but it didn't. I didn't even notice it." Further ". . . and I asked him emphatically, as a person would, if it would affect my eye or anything else, and he said 'No,' and I asked him about the surgery itself. He said I would incur a pretty good amount of swelling, and he said that would be the result; I mean he didn't pull no bones about that. He said there would be a medium amount of swelling, but that would be the only after effects as far as that goes, and then I asked him about opening my mouth wider, and he said I would be able to open my mouth at least as wide or wider, . . ." Plaintiff said that defendant explained to him that the pin was necessary because "you can't put a cast on your face" and that it would have to stay in place from 4 to 6 weeks, but the defendant did not say anything about the use of silicone. "I asked him a thousand questions. I mean every question imaginable as far as you would think of, and I would too on the situation. What would happen? What would be the results? I mean, what could happen to me? Everything like that. And I asked him emphatically about my eye. That was the main thing on both occasions I visited him. On July the 28th, he told me I'd have to wait for my scar to mature, and then I made another appointment October 14th, and then again we went through the same routine. He took me from one of the little offices into his own office, and explained to me again what the situation was and what would happen, and what would take forth, and what would transpire, you know, like that." Plaintiff again testified that defendant told him his eye would not be affected. "I had no idea . . . that the eye rested upon the bone itself. I thought it was a socket, you understand, I mean my layman terms and everything, and that's what he told me. He said there would be no damage whatsoever.

He said there would be a lot of swelling." The only question he didn't answer "was how my cheek was depressed and all, and he couldn't answer that, because that was something that was when I was born, and he really didn't know that, as far as that was concerned. He took me in there and he was very informative, I mean he took me in his office and he talked to me for probably half an hour when he had maybe twenty or thirty patients waiting out there to talk to him, and all, and that made me think he was very conscientious. I did have confidence in him as far as that went." When the bandage was removed while plaintiff was still in the hospital, the eyelid was pulled down, and he was told that the doctor "will have to go back over" and "Z" the scar again and the "eye will come back up in time". "[H]e said he usually had stitched this eyelid to this eyelid when he did this operation. He said he didn't think there was any need to in my case." "Those were the exact words that he said. Obviously, I mean, or he would have done it, you know."

Plaintiff was operated on on 28 November, remained in the hospital some 12 days, and was back at work by 14 December, continuing to work until sometime in late January. The pin was removed 11 January 1971, and the infection did not evidence itself until sometime thereafter.

Defendant by deposition testified that on plaintiff's first visit, nothing was said about plaintiff's eye. He "explained with the skull, . . . that it was a common procedure to elevate the cheekbone secondary to an old trauma or a depressed cheekbone or a depression of a congenital deformity, that one could open the tripart type fracture, meaning the cheekbone, elevate the cheekbone, bring it up to normal position and then to fix it in a normal position and hold it there until it became solid and fused bone and then remove the pin." He testified that it is more difficult to repair damage of long standing than a fresh fracture because in damage of long standing the bone has to be reopened with power tools to produce a fracture. Defendant explained to plaintiff fully the purpose of the surgery on plaintiff's first visit to his office. He further testified that in explaining the procedure to plaintiff he did not feel at that time and still did not feel at the time of the deposition that explanation of possible use of a silicone disc in the floor of the orbit was of any great importance, that "occasionally it is done when you have to elevate the zygoma; in some instances you do it, and in some instances you don't do it." The eye was never involved in

plaintiff's case, "it is the eyelid that you want to know about". The defendant testified that he said nothing about the possibility of infection on either visit of plaintiff to him prior to the surgery because "we are talking about something that has happened to me two times in twenty-three years". "I didn't feel that it was a point to discuss. If you tried to discuss one hundred things that can possibly occur, you can never get your work done. It is the probability that we must be interested in, I am thinking, in order to be fair with the patient which I always want to be fair with, and the probability was not that great or is not that great". He testified that it would be fair to say that there is always a risk of infection. Defendant did not recall whether anything was said at the second visit about the plaintiff's left eye. The infection "produced fibrous tissue and scar which then contracted and caused a pull down of the lid". Defendant did not know what caused the infection, but it was a slight and unlikely risk based on his experience. The judgment decision as to the use of silicone was one made based on the appearance and location of various bones after he was already into the operation and it was used as an added precaution "for the eyeball dropping down". Neither the silicone implant nor the pin caused the infection. The "risk of there being an infection and the infection causing a pull down of the eyelid was remote enough" to make him feel, as a plastic surgeon, that he had no duty to discuss it with the patient before the operation.

Construing the depositions in the light most favorable to defendant, we find nothing which would support a finding of misinformation; or misrepresentation, by omission or otherwise. Certainly plaintiff has produced no evidence that any representation made by defendant to plaintiff was false to the knowledge of defendant nor does plaintiff produce evidence of any facts which might nullify his consent to the surgical procedure. Plaintiff failed to carry his burden of "producing evidence of the necessary certitude" required on his motion for summary judgment. *Whitley v. Cubberly, supra,* and *Tolbert v. Tea Co., supra.*

With respect to defendant's motion for summary judgment on this third cause of action, considering the evidence presented by the two depositions in the light most favorable to plaintiff we conclude that the evidence would require a directed verdict for defendant and, therefore, the court correctly allowed defendant's motion. See 6 Moore's Federal Practice, 2d Ed., § 56.02[10].

Both parties, in oral argument and by their briefs, discuss at length the informed consent doctrine. Plaintiff relies on *Canterbury v. Spence*, 464 F. 2d 772 (C.A.D.C. 1972). There plaintiff alleged a negligent failure by the defendant to disclose a risk of serious disability inherent in the operation. There the court held that defendant had a duty to disclose to plaintiff damages in the proposed treatment and risks which might ensue from the proposed surgery and from not undergoing the surgery, and further that this duty to inform the patient is not dependent on the patient's request for information and disclosure. The court noted that this is the minority view and recognized that "[t]he majority of courts dealing with the problem have made the duty depend on whether it was the custom of physicians practicing in the community to make the particular disclosure to the patient. If so, the physician may be held liable for an unreasonable and injurious failure to divulge, but there can be no recovery unless the omission forsakes a practice prevalent in the profession. (Citations omitted.)" *Canterbury v. Spence, supra*, at 783. See 52 A.L.R. 3d 1084-1105 annotation. "Necessity and Sufficiency of Expert Evidence to Establish Existence and Extent of Physician's Duty to Inform Patient of Risks of Proposed Treatment."

An example of the obvious difficulties inherent in applying the rule of *Canterbury* is exemplified by the *Canterbury* Court's own statement:

"There is no bright line separating the significant from the insignificant; the answer in any case must abide a rule of reason. Some dangers—infection for example—are inherent in any operation; there is no obligation to communicate those of which persons of average sophistication are aware. Even more clearly, the physician bears no responsibility for discussion of hazards the patient has already discovered or those having no apparent materiality to patients' decision on therapy. The disclosure doctrine, like others marking lines between permissible and impermissible behavior in medical practice, is in essence a requirement of conduct prudent under the circumstances. Whenever non-disclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts. (Citations omitted.)" *Canterbury v. Spence, supra*, at 788.

Thus, it appears that the Canterbury Court would not require Dr. Berkeley to warn plaintiff that there was, as is always the case, a risk of infection attendant in surgery.

Two cases in this jurisdiction are of help. In *Watson v. Clutts,* 262 N.C. 153, 136 S.E. 2d 617 (1964), plaintiff sought damages for the personal injuries she alleged she suffered as the result of defendant's negligence in performing a subtotal thyroidectomy. In addition to allegations of negligence in performing the surgery, plaintiff alleged that defendant *negligently* failed to advise the plaintiff of the dangers involved in surgery and negligently failed to obtain an enlightened consent for the operation. The plaintiff there had also alleged that her surgeon had advised her that she would be hospitalized a week prior to surgery because of the seriousness of the operation and that the operation was not without risks. The Court held that she was bound by her pleading. In speaking to the question, the Court, through Justice Higgins, said:

> "Courts have expressed widely divergent views as to how far the surgeon should go in advising of dangers involved in a proposed operation. Plaintiff insists this Court should take the extreme view expressed in *Salgo v. Leland Stanford Jr. University Board of Trustees,* 154 Cal. App. 2d 560, 317 P. 2d 170: 'A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent.' See, also, 40 Minn. Law Review 876.

> Of course, the type of risk involved should have bearing on the completeness of the disclosure required. Obviously, brain or heart surgery involves high risks. Removal of an ingrown toe-nail ordinarily does not. However, a surgeon, except in emergency, should make a reasonable disclosure of the risk involved in a proposed surgical operation if the operation involves known risk. And yet, to send a patient to the operating room nervous from fright is not often desirable. The middle ground rule is admirably stated in 75 Harvard Law Review 1445: 'The duty narrows then, in the average case, to disclosure of dangers peculiar to the treatment proposed and of which it is likely that the patient is unaware. The doctor should have little difficulty in choosing from these the risks that are sufficiently serious and likely to occur as to be essential to an intelligent decision by his patient.'

Difficulty arises in attempting to state any hard and fast rule as to the extent of the disclosure required. The doctor's primary duty is to do what is best for the patient. Any conflict between this duty and that of a frightening disclosure ordinarily should be resolved in favor of the primary duty. And yet, the consent of the patient or of someone duly authorized to consent for him, except in emergencies, is required before the operation is undertaken. The surgeon should disclose danger of which he has knowledge and the patient does not—but should have—in order to determine whether to consent to the risk." *Watson v. Clutts, supra,* at 159.

In *Starnes v. Taylor,* 272 N.C. 386, 158 S.E. 2d 339 (1968), the plaintiff sought damages for alleged negligence by defendant in performing an esophagoscopy. Among other allegations of *negligence,* plaintiff alleged that defendant *negligently* failed properly to prepare and instruct the plaintiff prior to the operative procedure. Justice Lake wrote for the Court and stated that the Court deemed it unwise and unnecessary to attempt "to define precisely the extent and limits of the legal duty of a physician or surgeon to make known to his patient" the possible or probable adverse effects of a proposed treatment, including surgery. The Court did say, however:

"Where, as here, there is no contention of fraud or misrepresentation by the surgeon in order to induce the patient to undergo an unnecessary or unwise surgical procedure, and the likelihood of an adverse result is relatively slight, much must be left to the discretion of the physician or surgeon in determining what he should tell the patient as to possible adverse consequences. While the patient, or the person acting for him, has the right to an informed election as to whether to undergo the proposed operation, treatment or to take a prescribed drug, it must be borne in mind that the physician's or surgeon's primary concern at the time of consultation is, and should be, the treatment of the patient's illness or disability not preparation for the defense of a possible lawsuit. Obviously, an increase in the normal anxiety of one about to undergo a surgical procedure is not medically desirable. Advice, which is calculated to increase such anxiety by recounting unlikely possibilities of undesirable consequences, is not consistent with the above stated duty of the physician or surgeon to his patient. A

different situation is presented when the physician or surgeon knows, or should know, the proposed operation, treatment or drug has a high ratio of adverse reactions or complications of a serious nature, not likely to be known to the patient. See: *Sharpe v. Pugh, supra; Mitchell v. Robinson,* (Mo.) 334 S.W. 2d 11, 79 A.L.R. 2d 1017." *Starnes v. Taylor, supra,* at 393.

The Court noted that the record disclosed no evidence of any false statement or unwarranted assurance by defendant to the plaintiff.

To adopt the minority rule of *Canterbury* would result in requiring every doctor to spend much unnecessary time in going over with every patient every possible effect of any proposed treatment. The doctor should not have to practice his profession with the knowledge that every consultation with every patient with respect to future treatment contains a potential lawsuit and his advice and suggestions must necessarily be phrased with the possible defense of a lawsuit in mind. This would necessarily result in the doctor's inability to give the best interest of his patient primary importance. We think the majority rule with respect to informed consent is a much more practical one both in application and result. In the case before us, however, it appears that if the plaintiff's third cause of action had been grounded on negligent failure to disclose or inform, the court acted properly in denying plaintiff's motion for summary judgment and allowing defendant's motion. The *Canterbury* Court recognized the fact that risk of infection is something known to any person of ordinary sophistication. Plaintiff testified that he had accumulated enough semester hours to be classified as a senior in college. He is the son of a lawyer, and has two brothers and three uncles who are lawyers, so he is not from an uneducated background. Under the majority rule, plaintiff, on his motion for summary judgment, introduced no medical testimony as to the custom of physicians practicing in the community. However, as to defendant's motion, he testified that the only other incident of infection in his 23 years of practice of plastic surgery was one which occurred some 15 to 18 years previously; that the probability of infection was not so great as to warrant advising plaintiff of the possibility; that he had contacts with other plastic surgeons throughout the country and their experiences with onset of infection were as rare as his; that the risk of infection was "a slight and unlikely" risk and did not warrant

specific disclosure. This testimony was uncontradicted. Again, the evidence would have entitled defendant to a directed verdict, and the court did not err in granting his motion for summary judgment on plaintiff's third cause of action.

The result, then, is this:

As to defendant Charlotte-Mecklenburg Hospitial Authority —Affirmed.

As to plaintiff's first cause of action against defendant Berkeley—Reversed.

As to plaintiff's second cause of action against defendant Berkeley—Affirmed.

As to plaintiff's third cause of action against defendant Berkeley—Affirmed.

Judges BRITT and ARNOLD concur.