264 So.2d 792 (1972)
Gary J. BARRIOS, Individually and For the Use and Benefit of his minor Daughter, Christine Angel Barrios
v.
SARA MAYO HOSPITAL et al.
No. 4815.
Court of Appeal of Louisiana, Fourth Circuit.
July 5, 1972.
*793 David Gertler, New Orleans, for plaintiff-appellant.
Greenberg, Cohen & Dallam, Nathan Greenberg and Roger I. Dallam, Gretna, for defendants-appellees.
Before CHASEZ, LEMMON and BAILES, JJ.
LEMMON, Judge.
On December 13, 1967 Gary J. Barrios, individually and as administrator of the estate of his minor daughter, Christine, instituted this action for damages allegedly incurred when a slough or dead tissue appeared on Christine's forehead after she received an infusion in Sara Mayo Hospital. Made defendants were Dr. Ellen MacKenzie, the pediatric specialist who treated Christine; Sara Mayo Hospital, whose employees administered the infusion; and Insurance Company of North America, the alleged liability insurer of the hospital.
The insurer moved for a summary judgment, asserting that it had provided no liability coverage on the hospital in August, 1959. The trial court granted the summary judgment, and no appeal was taken. In the meantime Barrios by supplemental petition had joined Aetna Casualty and Surety Company, the hospital's insurer at the time of the infusion.
All defendants filed exceptions of prescription of one year provided in C.C. art. 3536. Additionally, the hospital filed an exception of no cause of action, asserting the doctrine of charitable immunity, and Aetna filed an exception of no cause of action, alleging that any negligence on the part of the hospital arose from professional acts, for which the company provided no coverage.
The district court rendered judgment on the exceptions, (1) dismissing the hospital, holding that it enjoyed immunity as a charitable institution; (2) overruling Aetna's exception of no cause of action, since the allegations of the petition, if accepted as true, did not support Aetna's contention; and (3) maintaining the exception of prescription as to any action in tort, but referring the alternative action for damages for breach of contract to the merits.
On appeal, this court upheld the dismissal of Sara Mayo Hospital on the grounds of charitable immunity (see 224 So.2d 846), and that judgment is now definitive.[1] C. C.P. art. 1842. This court further held that "plaintiff's action is prescribed insofar as it sounds in tort," but that "All pleas of prescription, insofar as they pertain to any contract to perform medical services, were referred to the merits. Such a judgment is interlocutory and no appeal lies therefrom."
Dr. MacKenzie then filed an answer and the case was tried on the merits against that defendant only.[2] From an adverse judgment, Barrios has perfected this appeal.
The trial court held that Barrios failed to prove by a preponderance of the evidence that he and Dr. MacKenzie entered into any form of contract to treat and care for Christine Barrios. We find that this conclusion is not supported by the record.
The child was born on September 25, 1958. During the next few weeks the child experienced vomiting, fever and constipation, and Dr. MacKenzie was first consulted on November 6, 1958. Over the next two months she undertook treatment of the child, mainly by altering the type and strength of formula and by prescribing a solution of electrolytes.
On August 3, 1959 the parents again consulted Dr. MacKenzie because the child was eating poorly, vomiting after *794 eating, and running a fever. The doctor diagnosed nutritional anemia, moderate dehydration, upper respiratory infection and skin rash. She prescribed medication, took the child off cow's milk and recommended giving her food that she could eat by hand. Two days later the parents insisted that the child be hospitalized, and Dr. MacKenzie admitted her to Sara Mayo Hospital. The doctor ordered tests and prescribed infusions of glucose, saline solution and Amigen, a protein supplement, to be given intravenously. It is now alleged that the infusion of the improper and dangerous drug, Amigen, resulted in the slough on Christine's forehead.
As to the contract, it was proved by direct questions and answers that Dr. MacKenzie undertook treatment of the child for the complaints stated by the parents, agreed to treat her in a proper medical manner, and charged the parents for the treatment administered. We believe that this evidence adequately establishes that a contract to treat and care for the child was entered into between the parties and that Dr. MacKenzie undertook treatment pursuant to this agreement.
Since we have concluded that a contract was entered into, we must next decide whether or not an action for damages for breach of that contract on account of the alleged improper performance of the treatment the doctor contracted to undertake must be brought within the period prescribed for bringing actions in tort.
This court held in Creighton v. Karlin, 225 So.2d 288 (La.App. 4 Cir. 1969):
"Accordingly, we hold that a failure to treat the patient with the standard of professional skill and care customarily prevailing in the locality can constitute a breach of, and give rise to an action on, the implied contract between patient and physician and such an action is prescribed by the lapse of ten years."
In that case the physician undertook to perform a gastrectomy in which he allegedly reconnected the intestines to a new opening in the abdomen in a twisted position. A second surgical procedure was required to correct this condition, and the suit was filed more than one year after the second surgery. This court reversed the granting of a summary judgment, finding that there was a genuine issue of material fact, and held that the damages alleged could be claimed not only in a suit in tort for breach of the physician's duty of care, but also in a suit in contract for breach of the implied obligation to undertake the treatment agreed upon with the degree of skill ordinarily exercised by members of the medical profession.
When a physician agrees to treat a patient and undertakes treatment pursuant to that agreement, he impliedly warrants that he will use ordinary skill and care consistent with accepted standards of the medical profession. The breach of this implied warranty may constitute a tort, but this does not mean that it does not also constitute a breach of contract which may give rise to an action for damages. While the breach would be a tort additionally, it would not be a tort exclusively.
In employing a physician to undertake the medical treatment of his complaints, a patient bargains for and is entitled to performance of that employment in a manner consistent with accepted standards. When the physician then breaches a duty owed to the patient under the contract by committing a tort, the patient has an action for damages, not only in tort, but also for breach of contract. Suits for damages for this type of breach of contract can be brought within the prescriptive period for actions for damages for other types of breaches of contract, namely ten years.
However, in our opinion Barrios has not proved by a preponderance of the evidence that Dr. MacKenzie breached her implied obligation to perform the treatment agreed upon with ordinary skill and care exercised by members of the medical profession.
*795 The intravenous infusions were ordered by Dr. MacKenzie by telephone instructions and were begun by hospital personnel prior to the doctor making her evening hospital rounds. When she visited the child in the hospital, she checked on the infusion, which was in place and dripping properly. Mrs. Barrios, who stayed with the child throughout the night, was instructed to contact the nurse if she noticed blood going back up into the needle. This occurred the next morning, and she contacted the nurse who, together with the extern, attempted to correct the problem but broke the apparatus in doing so and the solution spilled all over the child. Mrs. Barrios left the room while another needle was inserted. Later that day she noticed a blue tint in the forehead and spoke to Dr. MacKenzie about it on her evening visit.
Dr. MacKenzie stated that blue marks around the insertion are not uncommon and usually disappear in due course. When the condition worsened, the doctor prescribed various ointments and eventually referred the child to a dermatologist on September 8, 1959.
The slough can now only be corrected by reconstructive or plastic surgery.
Barrios contends that Dr. MacKenzie acted improperly by ordering the Amigen infusion without adequately informing herself of the properties of the solution. In support of this position he offered the testimony of a physician, who stated:
"Q. Why is it important that one who administers a particular drug know the tonicity of a drug?
"A. Well, hypertonic solutions can be harmful if improperly administered.
"Q. How many types of solutions are there?
"A. If you are referring to tonicity, its hyper, hypo, and iso.
"Q. Do you know whether amigen is iso, hypo, or hyper?
"A. Its hyper-tonic solution.
"Q. You say hyper-tonic solution can be harmful?
"A. Yes.
"Q. In what respect?
"A. It depends upon the degree of hypertonicity, but a marked hypertonic solution should be given only in the vein, and if not, if may damage the tissues around the vein." (Emphasis supplied.)
The doctor further testified that unless a child is critically ill, it is too risky to administer a hypertonic solution, which, if it leaks out of the veins, tends to draw water from the surrounding tissues and possibly damage or destroy cells in the area. In his opinion when Amigen is administered into the forehead and a slough develops, Amigen is the cause, and this happens frequently enough with hypertonic solutions that they should not be used except in extreme circumstances.
The evidence in this case fails in several respects. There was no testimony that Amigen was a marked hypertonic solution at any time, and the plaintiff's expert stated that he had no experience with Amigen in 1959. Furthermore, the hypertonic Amigen solution that he referred to was manufactured by a different company than the one which manufactured the solution which Dr. MacKenzie testified that she used in 1959. The doctor also testified that the Amigen solution she used was manufactured ready for intravenous infusion.
A pediatrician in practice since 1931 testified that the choice of solutions used in treating a malnourished and dehydrated child is a personal thing depending upon the doctor, but that many would have used Amigen in 1959 under similar circumstances. He further stated that doctors use many solutions which are hypertonic, but that in his many years of practice he had never seen a slough like this before from an infusion, which directly contradicted the testimony of the plaintiff's expert. In his opinion Amigen was not so *796 hypertonic that he would hesitate to use it, and he had used it in his own practice.
Another pediatrician in practice since 1958, who did not use Amigen because he was not familiar with it, testified that sloughs from infusions are rarely seen and that hypertonic solutions sometimes cause irritation, but not sloughing unless there is some additive such as antibiotics.
The trial judge in his Reasons for Judgment concluded that the expert testimony did not establish "that any action of Dr. McKensie [sic], either in prescribing the drug used or in having someone else (other than herself) administer the same, was something which was not customarily done in this community by pediatricians during the year 1959." We have thoroughly reviewed the record and are of the opinion that the trial judge did not commit manifest error in accepting the testimony of the defendant doctor and the expert witnesses presented by her, and rejecting the conflicting testimony of the expert witness presented by the plaintiff.
Accordingly, the judgment of the trial court is affirmed.
Affirmed.
NOTES
[1] This writer does not agree with the doctrine, but that issue is not before us.
[2] Between the first appeal and the trial on the merits in the district court, Aetna was dismissed from the suit on joint motion with plaintiff.