Linda E. **WOOLLEY** and Brandon Woolley

v.

**Lester K. HENDERSON.**

Supreme Judicial Court of Maine.

Argued Jan. 16, 1980.

Decided Aug. 28, 1980.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Ralph I. Lancaster, (orally), Louise K. Thomas, Portland, for plaintiffs.

Hunt, Thompson & Bowie, M. Roberts Hunt (orally), James M. Bowie, Portland, for defendant.

Before WERNICK, GODFREY, GLASSMAN and ROBERTS, JJ.

GLASSMAN, Justice.

The plaintiffs, Linda E. Woolley and her husband, Brandon Woolley, appeal from a judgment of the Superior Court, Somerset County, entered on April 13, 1979 following a jury verdict in favor of the defendant, Dr. Lester K. Henderson. On appeal in this medical malpractice action, the plaintiffs challenge rulings of the Superior Court Justice regarding the voir dire of the jury, the admission of evidence, the striking of an implied contract count in the complaint, the denial of a motion to add a battery claim to the complaint and the jury instructions concerning informed consent and the defendant's right to practice medicine. We vacate the judgment.

Linda Woolley suffered from a history of back problems and associated sciatic pain in her right leg. In 1965 she had back surgery for a ruptured disc at the interspace between her fourth and fifth lumbar vertebrae (L 4, 5). Experiencing renewed back pain, the plaintiff, in January of 1976, consulted the defendant, an orthopedic surgeon practicing in Skowhegan, who diagnosed a ruptured disc at the L 4, 5 vertebral interspace. When conservative treatment failed to alleviate the plaintiff's pain, the defendant performed a lumbar myelogram, a diagnostic procedure involving the use of dye and x–ray. On the basis of this test, the defendant recommended surgery. The extent to which he apprised the plaintiff of the risks of the proposed surgery is unclear.

In February of 1976, the defendant operated on the plaintiff, performing a laminectomy and foraminotomy at what he thought to be the L 4, 5 interspace. The defendant urged at trial, however, that because of the plaintiff's transitional vertebra, a congenital abnormality of the spine that makes counting and ascertaining the vertebral levels difficult, he in fact operated at the L 2, 3 and L 3, 4 interspaces, performing the surgical procedures at L 3, 4 rather than at L 4, 5. There was also evidence that the area of previous surgery was in fact L 3, 4 and not L 4, 5.

During the course of this operation, the defendant inadvertently made a rent in the dura, arachnoid and pia, the protective tissues encasing the spinal cord, while removing a small bone attached to epidural scar tissue. As a result, spinal fluid leaked from the plaintiff's spinal canal. Medical experts for both sides testified that a dural tear was a normal risk of this type of surgery, especially for a patient who had previous surgery at the location, and that a dural tear could occur at the hands of the most careful and competent surgeon.

Following surgery, the plaintiff's low back and radiating leg pain intensified. The defendant did not order further x–rays or myelograms, choosing to treat these symptoms with pain medication. Because her condition failed to improve, the plaintiff consulted another physician who, following examination and myelogram, removed protruding disc material at the L 4, 5 interspace in July of 1976. Although this surgical treatment alleviated the plaintiff's radiating leg pain, her back pain continued and subsequently intensified because she began to suffer from chronic adhesive arachnoiditis, an inflammation and thickening of the spinal cord that causes intractable back pain.

In a four–count complaint filed in the Superior Court on November 8, 1977, Linda Woolley alleged the defendant had breached an implied contract to perform surgery "in a good, workmanlike, professional, and

skillful manner"; the defendant had failed adequately to inform the plaintiff of the risks of surgery; and the defendant had been negligent in operating at the wrong level of the plaintiff's lumbar spine, in causing a dural tear, in his postoperative care and otherwise in his diagnosis and treatment of the plaintiff. Brandon Woolley included a claim for loss of consortium.

## I. Voir Dire

At an early stage of the voir dire examination, the presiding Justice granted the plaintiffs' motion to excuse five prospective jurors on the ground that current or former patients of the defendant or their close relatives had to be excused for cause.[1] Nevertheless, the presiding Justice refused the plaintiffs' request that those excused veniremen be required to leave the courtroom. During the course of the continued en masse voir dire, three of the excused jurors answered that they or close relatives had suffered from back problems. One of these jurors also stated that he was presently under a physician's care. Each excused juror gave a negative response when asked whether he had ever considered suing a physician. Two of the excused jurors stated that they would be unable to return a large plaintiffs' verdict against a physician even if they were satisfied that the plaintiffs were entitled to such a verdict and, furthermore, that they could not return a fair verdict in a medical malpractice action.

Following this colloquy, the plaintiffs moved for a mistrial, arguing that the answers given by the challenged jurors created the prejudicial impression among the remaining jurors that the excused jurors were satisfied with the medical treatment that they or family members had received from the defendant. Although the presiding Justice denied the mistrial motion, he then ordered the previously excused jurors to leave the courtroom. On appeal the plaintiffs contend that the presiding Justice erred in not directing the immediate discharge of those jurors that he had excused and in refusing to grant the mistrial motion because of the prejudice that resulted from the further voir dire of the excused jurors in the presence of the entire array.[2]

Although the scope and manner of voir dire are within the sound discretion of the presiding Justice, e. g., State v. Robbins, Me., 401 A.2d 161, 163 (1979), it is clearly an abuse of that discretion not to discharge promptly those jurors who have been excused for cause but rather to allow the challenged jurors to answer further voir dire questions in the presence of the panel from which the trial jury will be selected. M.R.Civ.P. 47(b) provides that challenges for cause be made "at the bench, at the conclusion of the examination." Id. Yet neither Rule 47(b) nor any other rule allows jurors to continue to participate in en masse voir dire when the challenge has been made and sustained at an earlier point in the examination. Cf. State v. Williams, 30 Me. 484, 485–86 (1849). That prejudice ensued from the unwarranted practice of the presiding Justice in the instant case is apparent from the answers given by the excused jurors in response to the further examination. The composite inference that emerged—some jurors thought so highly of the medical treatment accorded them or their family members by the defendant that they could not render a fair and impartial verdict—could have seriously impaired the ability of those who ultimately became members of the trial jury to determine whether the defendant was negligent in his treatment of Mrs. Woolley.

---

1. Although the plaintiffs identified by name only three jurors in their motion to excuse for cause, two other prospective jurors had also stated that they or members of their families were former patients of the defendant. It is clear from the record that the presiding Justice understood the motion to include these two jurors and intended to excuse them along with the jurors specifically identified in the motion.

2. In view of our disposition of this claim of error, we do not consider the plaintiffs' further contention that the defendant's counsel had a duty to disclose to the trial court prior to the voir dire the names of those prospective jurors or their family members who were patients or former patients of the defendant, the identity of whom counsel knew or should have known.

Because this error requires reversal of the judgment, we do not reach the plaintiffs' allegations concerning the admission both of hearsay evidence and of answers to leading questions. Nevertheless, we will consider several other claims of error as they will surely arise again in the course of the retrial.

## II. Informed Consent

At trial the plaintiffs seasonably objected to the jury instruction of the presiding Justice that the defendant's obligation to apprise Linda Woolley of the risks of the proposed surgery was limited to those disclosures which would be made by a reasonable medical practitioner. In *Downer v. Veilleux*, Me., 322 A.2d 82 (1974), this Court recognized the doctrine of informed consent as an actionable species of medical negligence:

> The doctrine is based on the general principle of law that a physician has a duty adequately to disclose to his patient the proposed diagnostic, therapeutic or surgical procedure to be undertaken, the material risks involved therein and the alternatives available, if any, so that a patient of ordinary understanding, confronted with these disclosures and faced with a choice of undergoing the proposed treatment, or selecting an alternative process, or preferring refusal of all medical relief, may, in reaching a decision, intelligently exercise his judgment by balancing the probable risks against the probable benefits. *Id.* at 90–91.

Our decision in *Downer* raised, but expressly left unresolved, the scope of the physician's duty to disclose and the test applicable in determining proximate causation. We are now called upon to determine these questions, which go to the core of the informed consent doctrine.[3]

### A. Scope of Disclosure Duty

∎ Although it is well settled that the law imposes on a physician a general duty

---

**3.** The historical underpinnings of the doctrine of informed consent are frequently attributed to the fiduciary character of the physician–patient relationship, *e. g., Lambert v. Park*, 597 F.2d 236, 239 n.7 (10th Cir. 1979); *Miller v. Kennedy*, 11 Wash.App. 272, 281, 522 P.2d 852, 860 (1974), *aff'd per curiam*, 85 Wash.2d 151, 530 P.2d 334 (1975), and to the patient's interest in the inviolability of his person. As Justice Cardozo wrote in *Schloendorff v. Society of New York Hosp.*, 211 N.Y. 125, 105 N.E. 92 (1914),

> [e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent, commits an assault for which he is liable in damages. This is true, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained. *Id.* at 129–30, 105 N.E. at 93. (Citations omitted).

Other early cases also recognized unauthorized treatment by a physician as a battery. *See Pratt v. Davis*, 224 Ill. 300, 305, 79 N.E. 562, 564 (1906); *Mohr v. Williams*, 95 Minn. 261, 266–271, 104 N.W. 12, 14–16 (1905); *Rolater v. Strain*, 39 Okl. 572, 573–578, 137 P. 96, 97–98 (1913). *See generally* McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment*, 41 Minn.L.Rev. 381 (1957); Annot., 56 A.L.R.2d 695 (1957).

Following the lead of these cases, some courts began to impose liability for battery on physicians who treated the plaintiff, however skillfully, without first informing him of the risks of treatment, reasoning that an uninformed consent is ineffectual. *See, e. g., Bang v. Charles T. Miller Hosp.*, 251 Minn. 427, 433, 88 N.W.2d 186, 190 (1958). A minority of jurisdictions continue to predicate liability for lack of informed consent on the theory of a technical battery. *E. g., Congrove v. Holmes*, 37 Ohio Misc. 95, 102, 308 N.E.2d 765, 770 (Ct.C.P. 1973); *Cooper v. Roberts*, 220 Pa.Super. 260, 264, 286 A.2d 647, 649 (1971).

Beginning with *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093, *clarified*, 187 Kan. 186, 354 P.2d 670 (1960), courts in increasing numbers recognized the inadequacy of the battery theory of liability and adopted the now–majority view which characterizes informed consent actions as based on professional negligence. W. Prosser, *Handbook of the Law of Torts* § 32, at 165–66 (4th ed. 1971); *e. g., Trogun v. Fruchtman*, 58 Wis.2d 569, 597–600, 207 N.W.2d 297, 312–13 (1973). *See also Salgo v. Leland Stanford Jr. Univ.*, 154 Cal.App.2d 560, 317 P.2d 170 (1957). In *Downer v. Veilleux, supra*, we adopted this majority approach, holding that the physician's failure to disclose was a form of medical malpractice. 322 A.2d at 89–90.

Courts continue to employ the doctrinal label "informed consent," a vestige of the battery theory, although this term is a misnomer in the negligence context. *See Karp v. Cooley*, 493 F.2d 408, 420 n.14 (5th Cir.), *cert. denied*, 419 U.S. 845, 95 S.Ct. 79, 42 L.Ed.2d 73 (1974).

reasonably to disclose to his patient significant information concerning treatment, jurisdictions differ on the scope of this disclosure obligation. Many courts hold that the duty of a physician to make adequate disclosure is, as in other cases of medical malpractice, measured by the standard of the reasonable medical practitioner under the same or similar circumstances. Under this "professional" disclosure standard, therefore, whether and to what extent a physician has an obligation to disclose a particular risk must in most cases be determined by expert medical testimony establishing the prevailing standard of practice and the defendant's departure therefrom. *See, e. g., Roberts v. Young,* 369 Mich. 133, 139, 119 N.W.2d 627, 630 (1963); *Collins v. Itoh,* 160 Mont. 461, 469, 503 P.2d 36, 41 (1972); *Folger v. Corbett,* 118 N.H. 737, 738, 394 A.2d 63, 63–64 (1978); *Wilson v. Scott,* 412 S.W.2d 299, 301–02 (Tex.1967).

On the other hand, an increasing number of courts hold that because a physician's obligation to disclose therapeutic risks and alternatives arises from the patient's right of physical self–determination, the disclosure duty should be measured by the patient's need for information rather than by the standards of the medical profession. These courts reason that physicians have a legal obligation adequately to disclose risk and option information that is material to the patient's decision to undergo treatment and that expert testimony as to medical standards is not required to establish this duty. Under this "material–risk" standard, although expert medical testimony may be

necessary to establish the undisclosed risk as a known danger of the procedure, the jury can decide without the necessity of a medical expert whether a reasonable person in the patient's position would have considered the risk significant in making his decision. *See, e. g., Canterbury v. Spence,* 464 F.2d 772, 786–87 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Cobbs v. Grant,* 8 Cal.3d 229, 243–45, 502 P.2d 1, 10–11, 104 Cal.Rptr. 505, 514–15 (1972); *Sard v. Hardy,* 281 Md. 432, 439–445, 379 A.2d 1014, 1020–22 (1977); *Wilkinson v. Vesey,* 110 R.I. 606, 620–626, 295 A.2d 676, 686–88 (1972).[4]

A basic principle of medical malpractice law is that the physician is not an insurer. "A poor result, standing alone, is insufficient to establish liability." *Downer v. Veilleux, supra,* 322 A.2d at 87. Thus, under no view of the doctrine of informed consent can liability be found for every failure to disclose a risk that has later materialized; despite solicitude for the informational needs of patients, liability for nondisclosure must still be based on fault. Underlying the conflict in the cases is a disagreement over the fundamental question whether fault in informed consent actions should be predicated on deviation from the professional standard of care or on interference with a patient's interest in physical self–determination. *See generally* 2 D. Louisell & H. Williams, *Medical Malpractice* ¶ 22.08 (1979). Consistent with our view of informed consent as a form of professional malpractice, we believe that fault must be

---

4. For other courts adopting the "material–risk" approach, *see Lambert v. Park, supra,* 597 F.2d at 238–39 (interpreting Oklahoma law); *Small v. Gifford Memorial Hosp.,* 133 Vt. 552, 557, 349 A.2d 703, 706 (1975); *Miller v. Kennedy, supra,* 11 Wash.App. at 288, 522 P.2d at 864; *Trogun v. Fruchtman, supra,* 58 Wis.2d at 599–604, 207 N.W.2d at 313–15. Some courts have formulated a hybrid approach or a variation on this standard. *See, e. g., Hamilton v. Hardy,* 37 Colo.App. 375, 379–82, 549 P.2d 1099, 1104–05 (1976); *Getchell v. Mansfield,* 260 Or. 174, 180–84, 489 P.2d 953, 956–57 (1971).

The informed consent doctrine and the scope of a physician's disclosure obligation have been the subject of extensive commentary. *See generally* 2 F. Harper & F. James, *The Law of*

*Torts* 58–61 (Supp.1968); A. Holder, *Medical Malpractice Law* 225 (2d ed. 1978); 2 D. Louisell & H. Williams, *Medical Malpractice* ¶¶ 22.-01–.08 (1979); McCoid, *The Care Required of Medical Practitioners,* in *Professional Negligence* 13, 50–61 (T. Roady & W. Anderson ed. 1960); Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw.U.L.Rev. 628 (1970); Note, *Informed Consent in Medical Malpractice,* 55 Calif.L.Rev. 1396 (1967); Note, *Failure To Inform as Medical Malpractice,* 23 Vand.L.Rev. 754 (1970); 75 Harv.L.Rev. 1445 (1962); Annot., 88 A.L.R.3d 1008 (1978); Annot., 52 A.L.R.3d 1084 (1973). For citation to additional commentary, *see Informed Consent to Therapy, supra,* at 628 n.1.

measured by reference to the reasonable medical practitioner in the same branch of medicine and not according to some variable lay standard of "materiality." [5]

■ When a patient alleges that an unrevealed hazard has caused him injury, the jury must determine whether, under the facts of the case, the physician has deviated from the standard of care of the reasonable practitioner. Although the unreasonableness of a particular nondisclosure may be " 'sufficiently obvious as to lie within common knowledge . . .,' " [6] *Cox v. Dela Cruz*, Me., 406 A.2d 620, 622 (1979), *quoting Cyr v. Giesen*, 150 Me. 248, 252, 108 A.2d 316, 318 (1954), in most cases expert medical testimony is just as necessary to establish negligence in failing adequately to disclose as it is to prove negligence in diagnosis or treatment. Whether the physician has acted unreasonably is often a question of professional judgment. In determining whether and how much he should disclose, the physician must consider the probable impact of disclosure on the patient, taking into account his peculiar knowledge of the patient's psychological, emotional and physical condition, and must evaluate the magnitude of the risk, the frequency of its occurrence and the viability of alternative therapeutic measures. *See, e. g., Patrick v. Sedwick*, 391 P.2d 453, 458 (Alas.1964); *Grosjean v. Spencer*, 258 Iowa 685, 692–95, 140 N.W.2d 139, 144–45 (1966). "This de-

termination involves medical judgment as to whether disclosure of possible risks may have such an adverse effect on the patient as to jeopardize success of the proposed therapy, no matter how expertly performed." *Aiken v. Clary*, 396 S.W.2d 668, 674 (Mo.1965).[7] Conceivably, full disclosure under some circumstances could constitute bad medical practice. *Collins v. Meeker*, 198 Kan. 390, 397, 424 P.2d 488, 495 (1967); *see* McCoid, *The Care Required of Medical Practitioners*, in *Professional Negligence* 13, 60–61 (T. Roady & W. Anderson ed. 1960).

Moreover, a rule that allows a plaintiff to establish the existence and extent of the defendant–physician's disclosure obligation without regard to medical standards hardly diminishes the importance of expert medical testimony or absolves the plaintiff from producing such evidence on other issues in the case. The courts that have adopted this rule recognize the necessity, in the usual case, of medical evidence to identify the known risks of treatment, the nature of available alternatives and the cause of any injury or disability suffered by the plaintiff, *e. g., Canterbury v. Spence, supra*, 464 F.2d at 791–92; *Sard v. Hardy, supra*, 281 Md. at 447, 379 A.2d at 1024, and would allow the defendant to show by expert testimony that his conduct comported with medical standards, *e. g., Sard v. Hardy, supra*, 281 Md. at 445, 379 A.2d at 1023; *Wilkinson v. Ves-*

---

**5.** Of course, lay witness testimony is competent to establish the physician's failure to disclose the particular risk, the patient's ignorance of the risk and, in some cases, the adverse consequences following treatment. *Bly v. Rhoads*, 216 Va. 645, 649, 222 S.E.2d 783, 787 (1976). The defendant maintains that 24 M.R.S.A. § 2905(1)(A) disallows recovery in informed consent actions where the conduct of the physician is shown to comport with prevailing standards of practice. We have no occasion to construe this statute, however, because the cause of action in the instant case arose before its enactment in 1977.

**6.** Additionally, there may be circumstances in which the professional standard is so clearly inadequate as to permit the conclusion that the entire profession is negligent. *See, e. g., The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

**7.** Courts that have rejected the need for medical evidence on the disclosure obligation nevertheless acknowledge that valid medical reasons may warrant nondisclosure. These courts posit that a physician has a "privilege" to withhold information for justifiable therapeutic reasons. *E. g., Canterbury v. Spence, supra*, 464 F.2d at 789; *Sard v. Hardy, supra*, 281 Md. at 443, 379 A.2d at 1022. Just how the concept of a "privilege" fits into a negligence action is unclear, but the net effect is to place upon the physician the burden of showing the reasonableness of his conduct. Presumably, the physician would raise this privilege by way of expert medical testimony. *Getchell v. Mansfield, supra*, 260 Or. at 180, 489 P.2d at 956; *see Small v. Gifford Memorial Hosp., supra*, 133 Vt. at 555, 349 A.2d at 705.

*ey, supra*, 110 R.I. at 624, 295 A.2d at 688; *see* note 7 *supra*.[8] Furthermore, when the patient also claims negligent diagnosis or treatment, he will have secured medical experts to testify to the applicable standard of care. *Bly v. Rhoads*, 216 Va. 645, 649, 222 S.E.2d 783, 787 (1976). It certainly adds little to the burden of the plaintiff on his informed consent claim to require him to produce medical evidence that the physician's nondisclosure departed from prevailing standards of practice. *Id.* at 651, 222 S.E.2d at 788.

In addition, we are not unmindful of the practical implications of dispensing with the requirement of expert medical testimony to establish the existence and extent of the disclosure duty in a given case. Inherent in such a rule is the potential danger that a jury, composed of laymen and gifted with the benefit of hindsight, will divine the breach of a disclosure obligation largely on the basis of the unfortunate result. In *Bly v. Rhoads, supra*, the Virginia court expressed a similar concern:

> The matters involved in the disclosure syndrome, more often than not, are complicated and highly technical. To leave the establishment of such matters to lay witnesses, in our opinion, would pose dangers and disadvantages which far outweigh the benefits and advantages a 'modern trend' rule would bestow on patient–plaintiffs. In effect, the relaxed 'modern trend' rule permits lay witnesses to express, when all is said and done, what amounts to a medical opinion. 216 Va. at 650, 222 S.E.2d at 787.

Finally, we believe that legal principles designed to provide compensation to persons injured by bad professional practice should not unduly intrude upon the intimate physician–patient relationship. Although the "material–risk" theory may make it easier for some plaintiffs to recover, it does so by placing good medical practice in jeopardy. The physician's attention must be focused on the best interests of his patient and not on what a lay jury, unschooled in medicine, may, after the fact, conclude he should have disclosed. As a North Carolina court noted,

> [t]o adopt the ["material–risk" standard] would result in requiring every doctor to spend much unnecessary time in going over with every patient every possible effect of any proposed treatment. The doctor should not have to practice his profession with the knowledge that every consultation with every patient with respect to future treatment contains a potential lawsuit and his advice and suggestions must necessarily be phrased with the possible defense of a lawsuit in mind. This would necessarily result in the doctor's inability to give the best interest of his patient primary importance. *Butler v. Berkeley*, 25 N.C.App. 325, 342, 213 S.E.2d 571, 581–82 (1975).

We hold, therefore, that the scope of a physician's duty to disclose is measured by those communications a reasonable medical practitioner in that branch of medicine would make under the same or similar circumstances and that the plaintiff must ordinarily establish this standard by expert medical evidence.[9]

---

8. Even these courts recognize limits on a physician's disclosure obligation. "The physician need not deliver a 'lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required[.]'" *Sard v. Hardy, supra*, 281 Md. at 444, 379 A.2d at 1022, *quoting Cobbs v. Grant, supra*, 8 Cal.3d at 244, 502 P.2d at 11, 104 Cal.Rptr. at 515. In addition, "disclosure is not required where the risk is either known to the patient or so obvious as to justify presumption of such knowledge, nor is the physician under a duty to discuss the relatively remote risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence." *Id.* at 445, 379 A.2d at 1022; *see Canterbury v. Spence, supra*, 464 F.2d at 788.

Nevertheless, these limitations on the disclosure duty are unlikely to afford a physician much guidance in his daily interactions with patients. Rather than relying on his professional judgment, a physician practicing in a "material–risk" jurisdiction may well feel compelled at his peril to disclose every imaginable risk and alternative to treatment. *See Butler v. Berkeley*, 25 N.C.App. 325, 340–43, 213 S.E.2d 571, 581–82 (1975).

9. We have recently ruled that "[a] medical specialist should be held to national standards of care and treatment appropriate to the specialty." *Roberts v. Tardif*, Me., 417 A.2d 444, 452 (1980).

### B.   Causation

▮ All courts recognizing the doctrine of informed consent as a species of medical negligence require the plaintiff to prove proximate causation by a preponderance of the evidence.   Otherwise, the physician's omission, however wrongful, is legally inconsequential.   As we noted in *Downer v. Veilleux, supra,* to establish a proximate causal relationship between the nondisclosure and the untoward result, the plaintiff must show not only that the undisclosed risk materialized causing him harm but also that had he been informed of the risk he would not have submitted to the treatment. 322 A.2d at 92.   The question we left open in *Downer* and which we now address is whether this second causation requirement is to be judged by a subjective test—whether the particular plaintiff would have undergone the treatment had he been adequately informed—or by an objective test—whether a reasonable person in the plaintiff's position would have submitted to the procedure had there been adequate disclosure.   *Compare Perin v. Hayne,* 210 N.W.2d 609, 618 (Iowa 1973) (suggesting in dictum subjective standard), *with Canterbury v. Spence, supra,* 464 F.2d at 790–91 (adopting objective test). *See generally* Waltz & Scheuneman, *Informed Consent to Therapy,* 64 Nw.U.L. Rev. 628, 646–48 (1970); 75 Harv.L.Rev. 1445, 1448–49 (1962).   In the instant case, the presiding Justice instructed the jury, without objection, that it was to apply the objective causation standard.

▮ We believe that the subjective test is an unsatisfactory gauge for determining causality in informed consent actions and, therefore, in accord with those courts that have squarely addressed this issue, we hold that causation should be judged by an objective standard.   *E. g., Canterbury v. Spence, supra,* 464 F.2d at 790–91; *Cobbs v. Grant, supra,* 8 Cal.3d at 245, 502 P.2d at 11–12, 104 Cal.Rptr. at 515–16; *Hamilton v. Hardy,* 37 Colo.App. 375, 381, 549 P.2d 1099, 1105 (1976); *Funke v. Fieldman,* 212 Kan. 524, 535–38, 512 P.2d 539, 549–50 (1973); *Sard v. Hardy, supra,* 281 Md. at 447–50,

379 A.2d at 1024–25; *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 13–16, 227 N.W.2d 647, 654–55 (1975); *see Aiken v. Clary, supra,* 396 S.W.2d at 676.   The Maryland court in *Sard v. Hardy, supra,* persuasively summarized the rationale in support of the objective standard:

> [I]f a subjective standard were applied, the testimony of the plaintiff as to what he would have hypothetically done would be the controlling consideration.   Thus, proof of causation under a subjective standard would ultimately turn on the credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result.   Such a test puts the physician in 'jeopardy of the patient's hindsight and bitterness.'   281 Md. at 449, 379 A.2d at 1025.   (Citations omitted).

Under the objective test, a causal connection exists between the defendant's failure to disclose and the plaintiff's injury only if a reasonable person in the position of the plaintiff would have declined the treatment had he been apprised of the risk that resulted in harm.   *Canterbury v. Spence, supra,* 464 F.2d at 791.   "[T]he patient's hindsight testimony as to what he would have hypothetically done, though relevant, is not determinative of the issue."   *Sard v. Hardy, supra,* 281 Md. at 450, 379 A.2d at 1025.

### III.   Battery Claim

After the close of evidence, the plaintiffs moved to amend their complaint to add a battery theory of recovery on the ground that evidence in the case tended to show that the defendant actually had performed surgery at the L 2, 3 and L 3, 4 interspaces rather than the surgery at the L 4, 5 interspace to which Mrs. Woolley had consented. The presiding Justice denied this motion, ruling that the plaintiffs' "wrong–level" theory had not been tried by the express or implied consent of the parties as required by M.R.Civ.P. 15(b).   We have no occasion to consider the propriety of this ruling, *see, e. g., Poulette v. Herbert C. Haynes, Inc.,* Me., 347 A.2d 596, 598 (1975), however, be-

cause even if the amendment had been allowed it would not have stated an actionable claim of battery on the facts of this case.

Although the decisions from which the informed consent doctrine developed were cases that imposed liability for unauthorized treatment on a theory of battery,[10] it is now settled, as we recognized in *Downer v. Veilleux, supra,* that despite the jurisprudential roots of the doctrine actions based on lack of informed consent sound in negligence and not in battery. 322 A.2d at 89–90. We noted that the modern approach confines the battery theory to cases where "the treatment is either against the patient's will or substantially at variance with the consent given." *Id.* at 89.

The plaintiffs' allegation that the defendant operated at the wrong lumbar interspace does not come within the narrow area in which physicians remain liable for battery in their treatment of patients. Here, Linda Woolley authorized the defendant to operate on her lumbar vertebrae in an attempt to relieve her discomfort. The defendant did not perform this surgery against the will of the plaintiff. *E. g., Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 128, 105 N.E. 92, 93 (1914); *cf. Wilkinson v. Vesey, supra,* 110 R.I. at 620, 295 A.2d at 686. Nor did the defendant perform an operation which he knew was substantially different from that to which the plaintiff had consented. *E. g., Mohr v. Williams,* 95 Minn. 261, 264, 104 N.W. 12, 13 (1905); *see Lane v. United States,* 225 F.Supp. 850, 852 (E.D.Va.1964); *cf. Cobbs v. Grant, supra,* 8 Cal.3d at 239–40, 502 P.2d at 7–8, 104 Cal.Rptr. at 511–12. In such egregious circumstances, the conscious disregard of the patient's interest in his physical integrity carries the physician's conduct outside of the physician–patient relationship. *See also Trogun v. Fruchtman,*

58 Wis.2d 569, 599, 207 N.W.2d 297, 313 (1973).[11]

We reject any shopworn doctrine that would impose liability for a battery on physicians whose treatment deviated from that agreed to, however slight the deviation and regardless of the reasonableness of the physician's conduct. *E. g., Wall v. Brim,* 138 F.2d 478, 481 (5th Cir. 1943), *cert. denied,* 324 U.S. 857, 65 S.Ct. 858, 89 L.Ed. 1415 (1944); *Pedesky v. Bleiberg,* 251 Cal. App.2d 119, 123–25, 59 Cal.Rptr. 294, 297–98 (1967); *Nolan v. Kechijian,* 75 R.I. 165, 168, 64 A.2d 866, 868 (1949). It places form over substance to elevate what is essentially a negligence action to the status of an intentional tort based on the fortuity that touching is a necessary incident to treatment in a relationship which is consensual in nature. *See also Cobbs v. Grant, supra,* 8 Cal.3d at 240, 502 P.2d at 8, 104 Cal.Rptr. at 512 (noting procedural consequences of recognizing battery theory). Therefore, as in other areas of professional liability, when a physician, acting in good faith and in what he believes to be the best interests of his patient, deviates from the proposed procedure or surgery, the issue is ordinarily whether under the circumstances the physician exercised due care in deviating from the proposed treatment and not whether he exceeded the scope of the patient's consent. *See Lane v. United States, supra,* 225 F.Supp. at 852. We believe that such a rule best accords with modern principles of medical malpractice favoring a single basis of liability predicated on fault and with the realities of the physician–patient relationship. *See generally* 1 D. Louisell & H. Williams, *Medical Malpractice* ¶ 8.09 (1977); McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment,* 41 Minn.L. Rev. 381, 383–84, 422–34 (1957).

---

10. *See* note 3 *supra* (discussing development of informed consent doctrine).

11. Obviously, a physician, like anyone else, may be liable for a battery if contact is wholly unauthorized or if he engages in flagrant misconduct toward another person. 1 D. Louisell

& H. Williams, *Medical Malpractice* ¶ 8.09 (1977). We are concerned here only with the viability of a battery theory for conduct which does not transcend the physician–patient relationship. *Cf. Estate of Berthiaume v. Pratt,* Me., 365 A.2d 792, 796 (1976).

## IV.   Implied Contract Count

Prior to trial, the defendant moved under M.R.Civ.P. 12(b)(6) to dismiss Count I of the plaintiffs' complaint on the ground that the breach of contract allegation failed to state a claim upon which relief could be granted. The presiding Justice denied this motion, concluding that Maine law recognized a breach of implied contract as a theory of recovery for medical malpractice.  Nevertheless, he ordered Count I stricken *sua sponte* on the ground that it was redundant in view of the negligence claim contained in Count III of the complaint.  On appeal, the plaintiffs challenge the action of the presiding Justice, arguing that breach of implied contract is an independent theory of recovery in medical malpractice actions and that such a claim was not duplicative of the negligence count.

In support of these contentions, the plaintiffs rely, as did the presiding Justice, on a frequently cited passage in *Coombs v. King*, 107 Me. 376, 78 A. 468 (1910), defining a physician's legal responsibility:

> He *contracts* with his patient that he has the ordinary skill of members of his profession in like situation, that he will exercise ordinary or reasonable care and diligence in his treatment of the case, and that he will use his best judgment in the application of his skill to the case.  *Id.* at 378, 78 A. at 468.  (Emphasis added).

Although *Coombs* and other early cases framed a physician's duty in terms of an implied representation that he possessed and would exercise a reasonable level of professional competence, *id.* at 378, 78 A. at 469; *e. g., Miller v. Toles*, 183 Mich. 252, 256, 150 N.W. 118, 120 (1914); *Leighton v. Sargent*, 27 N.H. 460, 469–71 (1853), it is now clear that the implied contract theory merely imposes a duty that tort law would in any event require.  *See generally* 1 Louisell & Williams, *supra*, at ¶ 8.03; Miller, *The Contractual Liability of Physicians & Surgeons*, 1953 Wash.U.L.Q. 413, 413–16.  With the development of modern tort principles, the majority of courts, usually in the context of whether contract or tort limitation or venue statutes govern the action, have

come to recognize that although the physician–patient relationship is typically consensual in nature the existence of this relationship imposes a duty of due care which arises in negligence rather than in contract.  *See, e. g., Harding v. Liberty Hospital Corp.*, 177 Cal. 520, 521–24, 171 P. 98, 99–100 (1918); *Benson v. Mays*, 245 Md. 632, 636, 227 A.2d 220, 223–24 (1967); *Lakeman v. La France*, 102 N.H. 300, 305, 156 A.2d 123, 127 (1959); *Yeager v. Dunnavan*, 26 Wash.2d 559, 562, 174 P.2d 755, 757 (1946).  *But see Zostautas v. St. Anthony De Padua Hospital*, 23 Ill.2d 326, 327–31, 178 N.E.2d 303, 304–05 (1961) (malpractice is hybrid action sounding in contract or tort); *Barrios v. Sara Mayo Hospital*, 264 So.2d 792, 794 (La.App.1972) (liability in contract or tort).

Illustrative of the modern view holding that malpractice actions are squarely grounded in principles of tort law is the leading case of *Kozan v. Comstock*, 270 F.2d 839 (5th Cir. 1959), in which the Fifth Circuit Court persuasively reasoned:

> It is the nature of the duty breached that should determine whether the action is in tort or in contract.  To determine the duty one must examine the patient–physician relationship.  It is true that usually a consensual relationship exists and the physician agrees impliedly to treat the patient in a proper manner.  Thus, a malpractice suit is inextricably bound up with the idea of breach of implied contract.  However, the patient–physician relationship, and the corresponding duty that is owed, is not one that is completely dependent upon a contract theory.  There are instances in which the relationship exists though there is clearly no contractual relationship between the patient and the physician.  Thus, the patient may be incapable of contracting or a third person may have contracted with the physician for the treatment of the patient.  Even in these instances in which no contract is present the physician still owes a duty to the patient.  The duty of due care is imposed by law and is something over and above any contractual duty.  Cer-

tainly, a physician could not avoid liability for negligent conduct by having contracted not to be liable for negligence. The duty is owed in all cases, and a breach of this duty constitutes a tort. On principle then, we consider a malpractice action as tortious in nature whether the duty grows out of a contractual relation or has no origin in contract. *Id.* at 844–45.

In addition to the inadequacy of implied contract as a comprehensive liability base in malpractice actions, we discern additional reasons for eschewing any reliance upon a theory that a physician has breached an implied contractual duty of due care. First, the reasonableness of a physician's conduct can be adequately determined under familiar tort principles without the necessity of importing into malpractice actions commercial concepts with traditionally distinct rules as to theory, proof, damages, limitation periods and venue. *See Kozan v. Comstock, supra,* 270 F.2d at 843–44 & n.16; 1 Louisell & Williams, *supra,* at ¶ 8.03. Second, and related to the foregoing, recognizing the continued vitality of implied contract as an independent cause of action would be fundamentally inconsistent with the modern view that malpractice actions should be predicated on a single basis of liability–deviation from the professional standard of care–with the application of common evidentiary and procedural rules.

■■■ We are not here concerned with a breach of an express contract between a physician and his patient. A physician may be liable in contract for breach of an express agreement to effect a cure or to achieve a particular result. *E. g., Depenbrok v. Kaiser Foundation Health Plan, Inc.,* 79 Cal.App.3d 167, 170, 144 Cal.Rptr. 724, 726 (1978); *Robins v. Finestone,* 308 N.Y. 543, 545–48, 127 N.E.2d 330, 331–32 (1955); *cf. Miller v. Dore,* 154 Me. 363, 365–66, 148 A.2d 692, 694 (1959) (express promises concerning treatment). *See generally* 1 Louisell & Williams, *supra,* at ¶ 8.10; Annot., 43 A.L.R.3d 1221 (1972). We hold only that where a plaintiff claims he has suffered personal injury as the result of a physician's faulty diagnosis or mis-

treatment his remedy lies in a complaint for negligence, not in an action based on an implied contract to exercise due care. *Huysman v. Kirsch,* 6 Cal.2d 302, 306, 57 P.2d 908, 910 (1936); *Cooper v. Edinbergh,* 97 Misc.2d 143, 145, 410 N.Y.S.2d 962, 964 (Sup.Ct.1978). In the instant case, the presiding Justice should have granted the defendant's motion to dismiss although his action in striking the count had the same effect.

## V. Instruction That Verdict Would Not Affect Defendant's Right To Practice Medicine

■■■ The plaintiffs contend that the presiding Justice erred in refusing to instruct the jury that its verdict would not affect the defendant's right to practice medicine. The plaintiffs posit as a popular notion that the jury verdict in a medical malpractice action is a general evaluation of the physician's competence rather than a specific judgment regarding a particular fact pattern. The requested instruction was necessary, the plaintiffs assert, to dispel this notion, which they claim was underscored by the defendant's repeated questioning concerning another physician's statement impugning the professional competence of the defendant.

This argument has no merit. The requested instruction was superfluous and its omission caused the plaintiffs no prejudice. *See Towle v. Aube,* Me., 310 A.2d 259, 266 (1973). A review of the charge in its entirety, *see id.,* reveals that the presiding Justice carefully instructed the jury to base its verdict only on the evidence in the case and to determine only the question of the defendant's culpability in his care and treatment of the plaintiff.

The entry is:

Appeal sustained.

Judgment vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

Costs awarded appellants.

WERNICK and GODFREY, JJ., concurring.

ROBERTS, J., concurring separately.

ROBERTS, Justice, concurring.

I agree with the disposition of each of the issues discussed in the court's opinion. On the question of the voir dire examination, I express my views separately because of an important difference in emphasis. That the conduct of voir dire rests in the sound discretion of the presiding justice means that he may elect any of several options without committing error. I would not find error in the justice's failure to remove excused jurors from the courtroom where some prejudice may incidentally result. In this instance, however, the danger of prejudice was eminently foreseeable.

The record indicates that counsel had previously discussed their requested voir dire questions with the presiding justice. Plaintiffs' request for removal of the excused jurors was made in the light of those questions and the apparent potential that they would elicit prejudicial responses. Thus plaintiffs said, "If they [excused jurors] remain and are asked the remaining questions we are running a very substantial risk of a mistrial." Defense counsel objected to plaintiffs' request even though he was in a position to know the nature of the responses those very jurors might give. If he did know, he was under no duty to his client to seek an unfair tactical advantage.

For the reason that a sound exercise of discretion requires that foreseeable prejudice be avoided, I concur in vacating the judgment.